Opinion by Justice O'Neill
In this interlocutory appeal, D Magazine Partners, L.P. d/b/a D Magazine (D Magazine) and Dallas Symphony Association, Inc. a/k/a Dallas Symphony Orchestra (DSO) challenge the trial court's partial denial of their motions for summary judgment on all claims urged by appellee Jose Reyes. See TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(6) (West Supp. 2016). D Magazine raises three issues in this Court, arguing the trial court should have granted summary judgment dismissing Reyes's claims for defamation per quod, negligence, gross negligence, and conspiracy. In two issues, DSO contends the trial court erroneously denied its motion for summary judgment on Reyes's claims for conspiracy and tortious interference with his employment relationship.
We dismiss DSO's appeal of Reyes's claim for tortious interference with employment *44 for lack of jurisdiction. We reverse the trial court's orders denying appellants' motions for summary judgment on Reyes's claims for defamation per quod, negligence, gross negligence, and conspiracy to defame Reyes.
BACKGROUND
In 2013, Jose Reyes worked for Bank of America and enjoyed volunteering for a number of civic enterprises, including DSO. Reyes was a member of the Vivaldi Patron Circle of the DSO, and he served the DSO in a number of capacities over approximately a ten-year period. However, some number of people associated with DSO developed issues with Reyes, and DSO received complaints about him from other volunteers and sponsors. On July 9, 2013, Jenny Shephard, vice president of development at DSO, called Reyes and terminated his position as a volunteer. She gave two reasons: Reyes's overstepping his boundaries in dealing with the press and his attending parties to which he was not invited. Reyes steadfastly denied both charges. Jonathan Martin, the DSO's president and CEO, approved the discharge.
A little after three o'clock on the morning of July 10th, Reyes emailed Martin from his computer at Bank of America. In this email (the Martin Email), Reyes referred to his lengthy service on behalf of DSO, stating that he had raised thousands of dollars for the organization over the years. Reyes reminded Martin that Bank of America was a major donor of DSO, and he stressed that "[w]e take our volunteer service, community involvement, and non-profit support of organizations very seriously here at Bank of America." Reyes went on to inform Martin of Shephard's call, saying he was "shocked and highly offended" by her comments, and Reyes warned that he would not "go quietly." Reyes asked for Shephard to be replaced and for his ouster to be reversed; he demanded a written apology.
Later that same day, Reyes's termination was made public when Chris Shull, DSO's manager of public relations, sent the following message to eighteen media outlets and sponsors:
The Dallas Symphony Orchestra would like to inform its sponsors and media partners that as of July 9, 2013 Jose Reyes is no longer affiliated as a volunteer with the Dallas Symphony Orchestra or with any of its volunteer organizations and/or organizing committees.
Thank you.
One recipient was D Magazine, which printed the message on its blog that afternoon. D Magazine also began to follow up on the story; a reporter, Jeanne Prejean, began looking into the reason why DSO had terminated Reyes.
Later that day, Kerri Cleghorn Lai-DSO's director of institutional giving-forwarded the Martin Email to Gillian Breidenbach, who served as a DSO contact at Bank of America. Breidenbach then forwarded the Martin Email to Scott Prince, Reyes's supervisor at the bank. She also told Prince that D Magazine was planning to write a story about Reyes. The bank initiated an investigation, and at some point Reyes was placed on administrative leave.
Prejean continued working on her story for D Magazine. On July 16th, she interviewed Reyes. The following day, Bank of America terminated Reyes's employment, stating the Martin Email violated company policy. The Prejean article was published in September 2013.
Reyes sued D Magazine and DSO. The defendants both filed motions for summary judgment, which were granted in part and denied in part. They appeal all grounds of the motions that were denied.
*45 THE MOTIONS FOR SUMMARY JUDGMENT
D Magazine filed a motion for summary judgment on both traditional and no-evidence grounds. The trial court granted the motion on Reyes's claims for defamation per se, intentional infliction of emotional distress, and tortious interference with prospective business relationships. This appeal addresses the claims on which the trial court denied summary judgment: defamation per quod, negligence and gross negligence, and conspiracy to defame.
As to Reyes's surviving defamation claim, D Magazine argued in its motion that (1) the statements on which Reyes's claim was premised were true or were non-actionable statements of opinion and, therefore, were incapable of defamatory meaning; (2) the statements were not made negligently; and (3) Reyes had suffered no damages from publication of the statements. The magazine argued further that Reyes's negligence and gross negligence claims should be dismissed because they were based on the same facts as the defamation claim. And the conspiracy claim, according to D Magazine's motion, must fail for lack of a substantive tortious act as well as a meeting of the minds between D Magazine and DSO.
DSO also filed a traditional and no-evidence summary judgment motion. The trial court granted DSO's motion on Reyes's claims for intentional infliction of emotional distress, defamation per se, defamation per quod, negligence, and tortious interference with prospective business relationships. DSO appeals the denial of its motion on grounds of conspiracy to defame Reyes and tortious interference with Reyes's employment relationship with Bank of America. According to DSO's motion, Reyes's conspiracy claim fails for lack of evidence that DSO conspired with D Magazine to publish any defamatory statements or otherwise commit any tortious conduct. And Reyes's interference-with-contract claim fails because: (i) Bank of America terminated his employment solely due to his poor employment history and various policy violations, and (ii) Reyes has no evidence that the DSO willfully or intentionally interfered with that relationship or caused Bank of America to fire him.
We apply well-known standards in our review of traditional and no-evidence summary judgment motions. See Timpte Indus., Inc. v. Gish , 286 S.W.3d 306, 310 (Tex. 2009) ; Nixon v. Mr. Prop. Mgmt. Co. , 690 S.W.2d 546, 548 (Tex. 1985). With respect to a traditional motion for summary judgment, the movant has the burden to demonstrate that no genuine issue of material fact exists and it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c) ; Nixon , 690 S.W.2d at 548-49. We review a no-evidence summary judgment under the same legal sufficiency standard used to review a directed verdict. TEX. R. CIV. P. 166a(i) ; Gish , 286 S.W.3d at 310. To defeat a no-evidence summary judgment, the nonmovant is required to produce evidence raising a genuine issue of material fact on each challenged element of its claim. Gish , 286 S.W.3d at 310 ; see also TEX. R. CIV. P. 166a(i). In reviewing both traditional and no-evidence summary judgments, we consider the evidence in the light most favorable to the nonmovant. Smith v. O'Donnell , 288 S.W.3d 417, 424 (Tex. 2009) ; 20801, Inc. v. Parker , 249 S.W.3d 392, 399 (Tex. 2008). We credit evidence favorable to the nonmovant if reasonable jurors could, and we disregard evidence contrary to the nonmovant unless reasonable jurors could not. Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding , 289 S.W.3d 844, 848 (Tex. 2009).
Within these standards, we review the summary judgment de novo. Travelers Ins. Co. v. Joachim , 315 S.W.3d 860, 862 (Tex. 2010). As a general rule, *46 when both no-evidence and traditional summary judgment motions are filed, we address the no-evidence motion first. See Ford Motor Co. v. Ridgway , 135 S.W.3d 598, 600 (Tex. 2004).
D MAGAZINE'S APPEAL
D Magazine raises three issues in this Court.
Defamation Per Quod
In its first issue, D Magazine contends the trial court should have dismissed Reyes's defamation per quod claim on traditional and no-evidence grounds. Defamation per quod is defamation that is not actionable per se. In re Lipsky , 460 S.W.3d 579, 596 (Tex. 2015).[2]
To maintain a defamation per quod cause of action, the plaintiff must prove that the defendant: (1) published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting with either actual malice, if the plaintiff was a public official or public figure, or negligence, if the plaintiff was a private individual, regarding the truth of the statement. WFAA-TV, Inc. v. McLemore , 978 S.W.2d 568, 571 (Tex. 1998). A defamation per quod plaintiff must also prove an injury causing damages. See Lipsky , 460 S.W.3d at 596. "To be actionable, a statement must assert an objectively verifiable fact." Main v. Royall , 348 S.W.3d 381, 389 (Tex. App.-Dallas 2011, no pet.). We determine whether a statement asserts such a fact-as opposed to a constitutionally protected opinion-as a question of law. Id. We construe the allegedly defamatory statement as a whole in light of the surrounding circumstances and based upon how a person of ordinary intelligence would perceive it. Turner v. KTRK Television, Inc. , 38 S.W.3d 103, 114 (Tex. 2000).
Allegedly Defamatory Statements
In his pleading, Ryes identified fifteen statements that he contends are defamatory. It is undisputed that the statements were published by D Magazine. Our first task, therefore, is to determine-as a matter of law-whether these statements are reasonably capable of a defamatory meaning from the perspective of an ordinary reader in light of the surrounding circumstances. See Hancock v. Variyam , 400 S.W.3d 59, 66 (Tex. 2013). If a statement is capable of a defamatory meaning, we ask next whether the summary judgment evidence established that the statement was false. See Main , 348 S.W.3d at 389-90 ("If we determine that the statements are not capable of a defamatory meaning, we need not consider whether the complained-of statements are false or not substantially true."). A true statement cannot form the basis of a defamation complaint. Double Diamond, Inc. v. Van Tyne , 109 S.W.3d 848, 855 (Tex. App.-Dallas 2003, no pet.).
We address Reyes's fifteen statements in turn to make these determinations.
(1) The Article's Headline: "The Talented Mr. Reyes: How a man of meager means and a mysterious past duped Dallas society."
Reyes contends the headline's reference to his means as "meager" is insulting, and he asserts that in fact his means are "just fine with him." Likewise, Reyes argues the references to his "mysterious past" and to his "duping Dallas society" inaccurately suggest he was hiding some dark secret or *47 that he engaged in deceptive conduct toward those around him in the DSO. D Magazine responds that the elements of the headline are no more than unverifiable opinions.
To determine whether a statement is fact or opinion, we focuses our analysis on the statement's verifiability and the entire context in which it was made. Bentley v. Bunton , 94 S.W.3d 561, 581 (Tex. 2002). Employing that standard, we agree with D Magazine that a reference to meager means is a subjective opinion, given that an income one person views as meager may be substantial to another. See Am. Heritage Capital, LP v. Gonzalez , 436 S.W.3d 865, 875 (Tex. App.-Dallas 2014, no pet.). This kind of description cannot be objectively verified because it amounts to a personal judgment that "rests solely in the eye of the beholder." Avila v. Larrea , 394 S.W.3d 646, 659 (Tex. App.-Dallas 2012, pet. denied). Accordingly, the description is not capable of a defamatory meaning.
As to the remainder of the headline-assertions that Reyes had a mysterious past and that he duped Dallas society-we conclude the headline writer was employing rhetorical hyperbole, an exaggeration employed for rhetorical effect. Backes v. Misko , 486 S.W.3d 7, 26 (Tex. App.-Dallas 2015, pet. denied) ; see also Tatum v. The Dallas Morning News, Inc. , 493 S.W.3d 646, 661 (Tex. App.-Dallas 2015, pet. filed). Viewed in the context of the article as a whole, we see no discussion of Reyes's "past" or of any effort on Reyes's part to trick members of the DSO in any fashion. Although the Article appears to chastise Reyes for describing his work in a call center as "marketing," to move from that characterization to descriptions of mysteries and trickery can only be seen as extravagant exaggeration. And that kind of rhetorical flourish is not actionable as defamation. Backes , 486 S.W.3d at 26.
We acknowledge that the headline and many other statements within the Article could be interpreted as criticism of Reyes, and they undoubtedly hurt his feelings. However, to the extent the statements amount to opinions that Reyes did not "fit" within Dallas society, they are not actionable. "[A] communication that is merely unflattering, abusive, annoying, irksome, or embarrassing, or that only hurts the plaintiff's feelings, is not actionable." Better Bus. Bureau of Metro. Houston, Inc. v. John Moore Servs., Inc. , 441 S.W.3d 345, 356 (Tex. App.-Houston [1st Dist.] 2013, pet. denied). We conclude the headline to the Article is not capable of defamatory meaning.
(2) Photo caption: "Social Butterfly: Jose Reyes strikes a pose with Anna-Sophia van Zweden (left) and Ana Pettus."
Next, Reyes points to a photo caption that called him a "social butterfly." In his deposition, Reyes testified that the term "label[ed] him in a negative context" and asserted that "labeling somebody with those words could be very hurtful." However, when pressed in the deposition, Reyes acknowledged the term "could mean several different things." And in this Court, Reyes defines the term as "one who is friendly or talks a lot," which is certainly not a negative connotation. Whether we accept Reyes's definition or accept his admission that the term may have many meanings, we must conclude that the caption merely expresses an opinion about him. Different people may consider the term positive or pejorative based upon their own preferences for social activity. Again, when a statement represents a personal judgment that "rests solely in the *48 eye of the beholder," it is not actionable as defamation. Avila , 394 S.W.3d at 646.
(3) "It seemed strange that so many people on the party circuit knew him, but none could say where he'd come from or what, precisely, he did for a living."
Reyes argues that this statement-that it was somehow "strange" that others involved with the DSO did not know his origins or his precise occupation-suggested "something undesirable or objectionable" about him. He objects further to the notion that his employment was of consequence to his volunteer work for the DSO. Matters of background and employment, he argues, should not impact his volunteer efforts. But this statement is not about verifiable qualifications to volunteer with the DSO. Instead, it is an opinion that Reyes lacked a well-known pedigree among those with whom he was socializing. Again, the question raised is whether Reyes "fit" on that "party circuit." The author's statement that it was unusual or "strange" for Reyes to travel on the circuit without such a pedigree is mere opinion. And as we have pointed out, an opinion is not actionable despite being unflattering or embarrassing. John Moore Servs., Inc. , 441 S.W.3d at 356.
(4) "But complaints about Reyes bubbled to the surface. People griped that he crashed parties, blustered his way into photos, and misrepresented his role with charities."
Reyes contends this statement depicts him as someone who "did not belong at parties, was rude and socially inappropriate, and lied." He argues the language of this statement portrays him as "dishonest and unscrupulous."[3]
We note at the outset that the statement literally reports the complaints of others; it is not written to relate a judgment of Reyes by D Magazine. Moreover, the language of "crashing" parties and "blustering" into photos certainly includes some rhetorical flourish. But the significant underlying premise here, and through much of the Article, is that Reyes was not welcome. That is an opinion, not a verifiable fact. Indeed, even in the circumstance where Reyes produced an invitation to a particular event he had attended, summary judgment evidence indicated that others associated with the DSO were unhappy-even "incensed"-at his presence. It is undisputed that complaints of this type were made within the DSO, and in context the Article was reporting that fact, not that the complaints were valid.
We conclude this statement, when viewed in context as an ordinary person would, is not capable of defamatory content.
(5) "For AT & T and then, later for Bank of America, he worked in a call center. Entry level for such a position would pay about $30,000 per year, making a $500 ticket a real sacrifice. Reyes did pay to get into some events, including the recent Young Friends spring party sponsored by the Ronald McDonald House of Dallas. And awhile back, he bought a ticket to the Art Ball, the annual Dallas Museum of Art fundraiser."
Reyes contends this statement demeans his position with Bank of America *49 because it suggests he was an "entry level" employee. He also argues the statement that he "did pay to get into some events" implies he improperly attended others for which he did not pay. Reyes explained in his deposition that by paying to become a member of the Symphony's Vivaldi Circle, he actually was a sponsor of certain events and could attend without further payment.
We understand each of the statements in this portion of the opinion to be statements of fact, but Reyes offers no evidence to prove they are false. Instead he argues that the remark leads to inferences that are demeaning concerning his position, income, and attendance at events. We are not persuaded that an ordinary reader would have found these statements demeaning. Likewise an ordinary reader would not have understood the remark that identified events for which Reyes had purchased tickets to accuse him of any improper conduct.
(6) "An organizer who worked on the reservation committee recalls that Reyes bought the least-expensive ticket and then stood at the front door greeting guests, as if to 'appear that he was a huge sponsor.' "
(7) "More than once, Reyes was portrayed as having a grander role in these events than he actually had."
We address these statements together because they amount to the same substantive remark: sources associated with the DSO told the author that Reyes behaved in a manner that exaggerated his importance to the organization. The statements are unquestionably the opinions of those DSO associates concerning whether Reyes was playing out his social role properly. While potentially embarrassing, these statements of opinion are not actionable. See John Moore Servs., Inc. , 441 S.W.3d at 356 (opinions that are merely abusive or embarrassing are not actionable).
(8) "As for the photo ops, Reyes'[s] efforts to have himself pictured with big names became problematic. Says one PR person: 'I used to feel sorry for him. Then the party crashing and photo setups/step-ins continued over and over. It just got pathetic.' "
(9) "This past spring, for instance, Reyes rushed up to one event photographer and said breathlessly, 'Come over here. Peggy Sewell wants to have her picture taken with me.' "
(10) "Eventually, PR people were told not to release photos to the media that had Reyes in them. One media type says she grew 'weary from people calling in, asking us not to run their picture ... when [Reyes] huddled up next to them.' "
These three statements describe the same perception: DSO associates preferred not to have their picture taken and released with Reyes, and they disapproved of his repeated efforts to be included in those photos. Once again, it was the opinion of these associates that Reyes was unworthy to be included in group photographs of DSO events. We need not approve of the opinions to determine they are not actionable.
(11) "Still, most non-profits were not inclined to sever ties with someone who offered free help and donations that in some cases were matched by his employer."
Reyes pleaded that this statement suggested he "was only allowed to volunteer so that the charity could take advantage of his employer's generosity." In deposition testimony he acknowledged that the facts included within the statement are true as to him, but he argued the statement was not necessarily true of all nonprofit organizations. We conclude the *50 statement is fact-based, rather than opinion, but Reyes failed to bring forward evidence that it was false. Accordingly, the statement is not defamatory.
(12) "But while Reyes was scoring points with them, the jig was just about up at the DS[A]. A highly placed source within the organization says Reyes crossed the line on two sensitive fronts. First, one of Jaap van Zweden's family made a formal complaint about Reyes. A member of the DS[A]'s elite Elan Circle agreed to check with others regarding their feelings about Reyes. Yes, they, too, had grown tired of his 'lurking and hanging around.' "
Initially, Reyes contends the statement's references to the "jig [being] up," to "cross[ing] the line," and to "lurking and hanging around" indicate he "was engaging in illegal or nefarious conduct." As we have stated, we lack jurisdiction in this case to evaluate whether a statement accuses Reyes of illegal conduct. That issue was decided against him when the trial court granted summary judgment to both defendants on defamation per se grounds, and Reyes has no right to appeal that decision as an interlocutory matter. As to the remainder of the statement, the article is reporting (1) an undisputed fact (that Reyes had been the subject of a complaint by Anna-Sophia van Zweden) and (2) the opinions of some members of the Elan Circle that they had grown tired of Reyes's presence at DSO events. Neither can form the basis of a successful defamation claim.
(13) "One person in the crowd stuck out: Jose Reyes. No one claimed to have invited him, and one key DS[A] sponsor was incensed by his presence."
This statement appears in the article's discussion of the DSO's 2013 Gala Launch Party, which is described as an invitation-only affair held at the private estate of symphony supporters. Prejean testified she was unable to identify anyone who had invited Reyes. Reyes testified he was invited by Tab Boyles, DSO's director of event planning, but Boyles testified he sent Reyes an email identifying details of the party after Reyes called and represented that he had lost his invitation. DSO staff testified that Reyes was not invited and indeed that a representative of an important corporate sponsor had specifically requested that Reyes not be invited. Therefore, we conclude the article's statement that no one claimed to have invited him was in fact true. Likewise, the summary judgment record supports the statement that the corporate representative was annoyed when Reyes showed up at the party when she had specifically requested he be excluded. Because the statement is true, it cannot support a defamation claim.
(14) "Asked how things are going with his job at the bank, he replies that everything is fine, that the bank's main concern is how the DS[A] has mistreated him. The next morning, Bank of America fired Reyes."
Reyes concedes that the first sentence of this statement correctly quotes what he told the article's author. Likewise, he acknowledges being fired by the Bank. Reyes's own statement cannot form the basis of his defamation claim. Nor can a true statement of fact.
(15) Photo caption: "Balling on a Budget: No one knew Reyes worked at a Bank of America call center. He told people he worked in 'marketing.' "
Although Reyes's summary judgment evidence includes his deposition testimony that he does not recall telling people he was in marketing, he goes on to testify that his call center division at the bank was called Direct Marketing, so that this *51 statement-if he had made it-was true. Once again, the statement could be read by an ordinary reader as critical of Reyes and demeaning to call-center employment. But that criticism is merely the opinion of those who believed Reyes did not belong in their social set; it is not actionable as defamation.
We conclude that none of Reyes's fifteen statements qualifies as a false statement of verifiable fact. While it is apparent that the Article repeated many personal criticisms of Reyes in a manner that undoubtedly hurt his feelings, we conclude none of these statements can support a defamation claim against D Magazine.
Allegedly Defamatory "Gist" of the Article
Reyes pleaded further that-even if none of the individual statements were adjudged defamatory-the article taken as a whole is defamatory. It is true that we construe an allegedly defamatory publication "as a whole"; we view the publication in light of the surrounding circumstances, and we attempt to discern how a person of ordinary intelligence would perceive it. Turner v. KTRK Television, Inc. , 38 S.W.3d 103, 114 (Tex. 2000). Nevertheless, we do not consider a claim that the "gist" of an article-rather than specific statements within it-is defamatory unless the publication omits material facts or juxtaposes facts in a misleading way. Id. at 115.[4]
Moreover, if we were to address whether the gist of the Article was defamatory, and we accepted Reyes's own statement of the gist as accurate, we could not come to a different conclusion than we do after addressing each of Reyes's fifteen allegedly defamatory statements individually. Reyes contends that as to the issues in this appeal:
the "gist" of the Article was that Jose Reyes was fired as a volunteer by the DSO in a very public way because he was a party-crasher/trespasser, deceived people, blustered his way into photographs and misrepresented his role with charities.
We have addressed these allegations individually and determined they are not defamatory; stating them in concert does not change their meaning. Nor do we discern any evidence of missing or "juxtaposed" facts that would alter our analysis of the statements if taken together. See Turner , 38 S.W.3d at 115.
We conclude Reyes has failed to bring forward evidence establishing a genuine issue of material fact concerning whether D Magazine published a defamatory statement about him. As a result, D Magazine was entitled to summary judgment on Reyes's defamation per quod claim.
We sustain D Magazine's first issue. Because we have concluded that Reyes did not carry his burden to raise a fact issue on the existence of a defamatory statement, we need not address D Magazine's alternative grounds for summary judgment on this claim, namely Reyes's failure to bring forth evidence of a fact issue on the elements of negligence and damages.
Conspiracy to Defame
In its second issue, D Magazine challenges the trial court's denial of *52 its motion for summary judgment on Reyes's claim for conspiracy to defame. A civil conspiracy involves a combination of two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means. Tilton v. Marshall , 925 S.W.2d 672, 681 (Tex. 1996). "[A] defendant's liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable." Id.
In this case, the trial court granted summary judgment for DSO on all defamation claims and for D Magazine on Reyes's defamation per se claim. We have now concluded that D Magazine is entitled to judgment on Reyes's defamation per quod claim as well. In the absence of a viable claim for defamation against a named defendant (i.e., either D Magazine or DSO), Reyes's claim for conspiracy to defame must fail. See, e.g., Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co. , 51 S.W.3d 573, 582-83 (Tex. 2001) (summary judgment correctly granted on underlying tort claim "necessarily disposes of" claim for conspiracy to commit that underlying tort). There can be no independent liability for civil conspiracy. W. Fork Advisors, LLC v. SunGard Consulting Servs., LLC , 437 S.W.3d 917, 920 (Tex. App.-Dallas 2014, pet. denied).
We sustain D Magazine's second issue.
Negligence and Gross Negligence
In its third issue, D Magazine argues the trial court should have granted its summary judgment motion on Reyes's negligence and gross negligence claims because Reyes failed to come forward with evidence establishing any element of those claims. The magazine argues Reyes's negligence and gross negligence claims were all based upon the same publication as his defamation claims, so they should have been treated as defamation claims and dismissed. Although we can posit a case in which a plaintiff could properly plead both a defamation and an independent negligence claim, we agree with D Magazine that the negligence claims in this case fail to state an independent theory of recovery.
In fact, Reyes's pleading of his negligence claims does no more than state that D Magazine and DSO were negligent, or grossly negligent, in publishing the defamatory statements.[5] Rather than stating the *53 elements of an independent claim, the pleading sets forth Reyes's contentions as to the negligence element of his defamation claim. See McLemore , 978 S.W.2d at 571 (defamation plaintiff must prove defendant was acting with "negligence, if the plaintiff was a private individual, regarding the truth of the statement"); see also Neely v. Wilson , 418 S.W.3d 52, 72 (Tex. 2013) ("For the purposes of defamation liability, an author is negligent if she knew or should have known a defamatory statement was false."). Reyes's brief in this Court likewise fails to identify an independent tort claim. He points to no independent duty that has been breached. Instead, his contentions are mere restatements of the negligence element of his defamation claim.
Reyes has not identified a fact issue on a separate, freestanding claim for negligence or gross negligence apart from his defamation claim. He failed to carry his burden to come forward with evidence of such a separate claim. Accordingly, D Magazine was entitled to summary judgment on Reyes's independent negligence and gross negligence claims.
We resolve D Magazine's third issue in its favor.
DSO'S APPEAL
DSO raises two issues in its appeal, challenging the denial of its motion for summary judgment on Reyes's claims for conspiracy and tortious interference with his employment relationship with Bank of America. As a threshold issue, however, we address Reyes's contention that this Court lacks jurisdiction over DSO's interlocutory appeal.
Jurisdiction
Both appellants bring their interlocutory appeals pursuant to the civil practice and remedies code's authorization of an appeal from an order that:
denies a motion for summary judgment that is based in whole or in part upon a claim against or defense by [a] a member of the electronic or print media, acting in such capacity, or [b] a person whose communication appears in or is published by the electronic or print media, arising under the free speech or free press clause of the First Amendment to the United States Constitution, or Article I, Section 8, of the Texas Constitution, or Chapter 73.
TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(6). Reyes has challenged this Court's jurisdiction over DSO's appeal. He contends his conspiracy and tortious interference claims-and DSO's defenses to those claims-do not arise under free speech or press guarantees but are "separate from the defamation claim" and, therefore, do not fall within the scope of section 51.014(a)(6).
At the outset, we reject Reyes's argument that his conspiracy to defame claim is "separate from" his defamation claim. The conspiracy claim is rooted in the defamation facts and, indeed, can only survive in the presence of a claim for the underlying tort. See Tilton , 925 S.W.2d at 681. Accordingly, we conclude Reyes's *54 claim for conspiracy to defame is within the scope of section 51.014(a)(6), and we have jurisdiction to address DSO's arguments concerning that claim.
But DSO contends section 51.014(a)(6) allows interlocutory appeal of all claims decided by the summary judgment order, not merely those implicating rights of free speech and press. Thus, DSO argues we also have jurisdiction to address its appeal related to Reyes's tortious interference claim. DSO relies upon this Court's opinion in New Times, Inc. v. Doe , 183 S.W.3d 122 (Tex. App.-Dallas 2006, no pet.). In that case, Doe sued New Times, Inc., the Dallas Observer, and J.D. Sparks for violations of the Texas Communicable Disease Prevention and Control Act after the Observer published an article by Sparks that allegedly revealed Doe's status as HIV positive. The trial court denied motions for summary judgment by the three defendants, and they appealed pursuant to section 51.014(a)(6). Id. at 123-24. As the New Times opinion begins its discussion of the standard of review and applicable law, it makes this single reference to any jurisdictional concern:
Although this is an interlocutory appeal under section 51.014(a)(6) of the Texas Civil Practice and Remedies Code, the parties do not contend our review of the issues presented is limited. See TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(6) ; K-Six Television, Inc. v. Santiago , 75 S.W.3d 91, 96 (Tex. App.-San Antonio 2002, no pet.) (where media defendant's motion for summary judgment relied in part on law of libel under statute included in section 51.014(a)(6), entirety of trial court's orders were appealable under section 51.014(a)(6) ).
Id. at 124. The only claims before the New Times trial court at the time of the summary judgment proceeding were for wrongful disclosure of test results under the statute and conspiracy among the defendants to make the disclosure; neither claim immediately appears to involve free speech or press issues. Indeed, the appeal was decided on appellants' first summary judgment ground: that appellants did not disclose "test results" as the statute forbids. Id. at 127. But the second summary judgment ground did invoke a constitutional speech issue: that "punishment for the publication of true, non-private, lawfully obtained information, which would not further a state interest of the highest order, would violate the Texas and United States constitutions." Id. at 124. Given that the lawsuit, and the interlocutory appeal, turned on publication of allegedly wrongful information by a media defendant, we do not understand this opinion's comment to intend anything more than the Court's ability to look to all grounds of the summary judgment motion so long as the claim or defense at issue involved-at least in part-free speech or press issues.
The supreme court has directed courts to construe the provisions of section 51.014(a) narrowly. Tex. A & M Univ. Sys. v. Koseoglu , 233 S.W.3d 835, 841 (Tex. 2007). Our primary concern in any such construction is to give effect to the Legislature's intent. Tex. Lottery Comm'n v. First State Bank of DeQueen , 325 S.W.3d 628, 635 (Tex. 2010). We rely in the first instance on the plain meaning of the text as expressing legislative intent. Id. The language of section 51.014(a)(6) speaks to appeals involving libel claims against media and media sources. We conclude the purpose of this section is to allow immediate appeal of claims involving free speech or press issues that are directed at the press or those the press rely upon as sources of information. To the extent that any court or party has read New Times to suggest that interlocutory review is available more broadly, we reject that reading.
*55 Our review under section 51.104(a)(6) is limited to the denial of summary judgment on claims or defenses implicating rights of free speech or free press.[6]
We conclude we lack jurisdiction to address DSO's appeal of the denial of its motion for summary judgment on Reyes's claim for tortious interference with his employment relationship. Accordingly, we do not address DSO's second issue, and we dismiss that portion of DSO's appeal.
Conspiracy to Defame
Because we have dismissed DSO's tortious-interference appeal for lack of jurisdiction, only one issue remains in its appeal-whether the trial court erred in denying DSO's motion for summary judgment on Reyes's conspiracy claim. Reyes pleaded that DSO and D Magazine "engaged in a conspiracy to defame [Reyes] with the defamatory communications." Conspiracy to defame is reviewable because it is based, in part, upon the defamation claims Reyes urged against both named defendants. Vice v. Kasprzak , 318 S.W.3d 1, 10 (Tex. App.-Houston [1st Dist.] 2009, pet. denied).
As we have discussed, a defendant's liability for conspiracy requires his participation in an underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable. Tilton , 925 S.W.2d at 681. In its first issue, DSO argues that because all of Reyes's claims for defamation against DSO were dismissed by the trial court, there is no underlying tort on which to predicate any conspiracy liability. However, as long as Reyes's claim against D Magazine for defamation per quod survived the magazine's summary judgment motion, there was still an underlying tort for which Reyes seeks to hold one named defendant (i.e., D Magazine) liable. "[C]ivil conspiracy 'came to be used to extend liability in tort ... beyond the active wrongdoer to those who have merely planned, assisted, or encouraged his acts.' " Hong Kong Dev., Inc. v. Nguyen , 229 S.W.3d 415, 448 (Tex. App.-Houston [1st Dist.] 2007, no pet.) (citing Carroll v. Timmers Chevrolet, Inc. , 592 S.W.2d 922, 925-26 (Tex. 1979) ). Stated differently, a party may be liable for conspiracy even if it did not commit the underlying tort itself, so long as another named defendant is found liable for the tort. Therefore, so long as Reyes had a claim for defamation, he could urge a conspiracy claim against both defendants.
In the course of this appeal, though, we have concluded that D Magazine was entitled to summary judgment on the final pending defamation claim. Because there is no longer an underlying tort for which one of the defendants could be held liable, there can be no claim for conspiracy to commit that underlying tort. Tilton , 925 S.W.2d at 681. DSO is entitled to summary *56 judgment on Reyes's claim for conspiracy to defame him.
We sustain DSO's first issue.
Conclusion
We dismiss for lack of jurisdiction DSO's appeal of the denial of its motion for summary judgment on Reyes's claim for tortious interference with employment. We reverse the trial court's order denying DSO's motion for summary judgment on Reyes's claim for conspiracy to defame, and we render judgment that Reyes shall take nothing on that claim.
We reverse the trial court's order denying D Magazine's motion for summary judgment on Reyes's claims for defamation per quod, conspiracy to defame, negligence, and gross negligence, and we render judgment that Reyes shall take nothing on those claims.
DISSENTING OPINION ON DALLAS SYMPHONY ASSOCIATION, INC.'S MOTION FOR EN BANC RECONSIDERATION
Dissenting Opinion by Justice Evans
Dallas Symphony Association, Inc. (DSA) moves for en banc reconsideration of the panel's decision to dismiss for lack of jurisdiction its issue challenging the trial court's denial of summary judgment with respect to appellee Jose Reyes's claim for tortious interference with employment. The panel concluded that section 51.014(a)(6) of the Texas Civil Practice and Remedies Code did not grant appellate jurisdiction to review all of DSA's grounds for summary judgment that were denied in the interlocutory order but required a claim-by-claim analysis to determine which summary judgment grounds were based on a free-speech claim or defense.[1] The panel concluded the denial of summary judgment on Reyes's claim for tortious interference with employment did not pertain to a free-speech claim or defense for which reason this Court lacked jurisdiction for appellate review of the trial court's denial of summary judgment as to that claim. DSA contends (1) the plain meaning of section 51.014(a)(6) grants jurisdiction to review all summary judgment grounds denied in an interlocutory order so long as at least one ground was based on a free-speech claim or defense, (2) the appellate courts in Texas have split over this question, the majority of which have concluded section 51.014(a)(6) grants jurisdiction to review all grounds when at least one denied ground of summary judgment was based on a free-speech claim or defense, and (3) this Court has authority favorable to DSA on this issue. Because a majority of the Court votes to deny en banc reconsideration, I dissent from that decision and from the panel's jurisdictional decision for the reasons stated below.
Text of Section 51.014(a)(6)
Reyes and DSA argue, and the panel opinion concluded, that the meaning of section 51.014(a)(6) of the civil practice and remedies code determines whether we have jurisdiction, so I begin there. See TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(6) (West Supp. 2016). We review statutory construction questions de novo. State v. Shumake , 199 S.W.3d 279, 284 (Tex. 2006). In construing statutes, we seek to determine the Legislature's intent where possible from the text. Id. We "presume the Legislature chose statutory language deliberately and purposefully."
*57 Crosstex Energy Servs., L.P. v. Pro Plus, Inc. , 430 S.W.3d 384, 390 (Tex. 2014). We use the context of words and phrases "construed according to the rules of grammar and common usage" giving words their ordinary meaning except where they are defined by statute or have acquired technical or particular meaning. See TEX. GOV'T CODE ANN. §§ 311.011, 312.02 (West 2013). We may not add words to a statute that are not already "implicitly contained" in the statute's language or amend a statute. See Fitzgerald v. Advanced Spine Fixation Sys., Inc. , 996 S.W.2d 864, 867 (Tex. 1999) (court may not "judicially amend the statute to add an exception not implicitly contained in the language of the statute"); Lee v. City of Houston , 807 S.W.2d 290, 294-95 (Tex. 1991) ("A court may not ... add words that are not implicitly contained in the language of the statute.").
The plain meaning of section 51.014(a)(6) confers jurisdiction for interlocutory review of entire orders denying summary judgment so long as the motion for summary judgment included a ground based in whole or in part on a claim or defense involving the free-speech clause. The statute provides:
(a) A person may appeal from an interlocutory order of a district court, county court at law, statutory probate court, or county court that:
* * *
(6) denies a motion for summary judgment that is based in whole or in part upon a claim against or defense by a member of the electronic or print media, acting in such capacity, or a person whose communication appears in or is published by the electronic or print media, arising under the free speech or free press clause of the First Amendment to the United States Constitution, or Article I, Section 8, of the Texas Constitution, or Chapter 73[.]
TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(6) (emphasis added). Subsection (a) provides that an interlocutory appeal may be perfected from an interlocutory order that is described by one of the subsections that follow. Id. § 51.014(a). There is no language that limits the phrase "interlocutory order" to only certain relief contained within an interlocutory order. See id. The statute instead authorizes "appeal from an interlocutory order...." See id.
Subsection (a)(6) requires that to be appealable the interlocutory order must deny a motion for summary judgment described in the remainder of the sentence. See id. § 51.014(a)(6). Texas Rule of Civil Procedure 166a governs motions for summary judgment. See TEX. R. CIV. P. 166a. Rule 166a(c) allows a single motion for summary judgment to include multiple grounds and to challenge multiple causes of action by using the plural "grounds" and "issues" when the rule provides that a motion for summary judgment must "state the specific grounds" and may be granted on "the issues expressly set out in the motion." See TEX. R. CIV. P. 166a(c). In light of rule 166a 's allowance for multiple-ground motions for summary judgment, section 51.014(a)(6) requires that to be appealable an interlocutory order must deny a summary judgment motion that is "based in whole or in part upon a claim ... or defense" arising under the free-speech clause of the First Amendment.
In subsection (a)(6), the phrase, "based in whole or in part," has further importance for this jurisdictional analysis and is easily understood. See TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(6). "[T]he Legislature's use of the disjunctive word 'or' is significant when interpreting statutes." City of Lorena v. BMTP Holdings, L.P. , 409 S.W.3d 634, 642 (Tex. 2013). "[T]he use of the disjunctive conjunction 'or' between *58 the two phrases ... signifies a separation between two distinct ideas." Spradlin v. Jim Walter Homes, Inc. , 34 S.W.3d 578, 581 (Tex. 2000) ; see City of Dallas v. TCI W. End, Inc. , 463 S.W.3d 53, 58 (Tex. 2015) ("The statute's use of 'or,' a disjunctive, identifies two alternative bases for recovering civil penalties."). So in section 51.014(a)(6)"in whole" is an alternative basis to "in part." As relevant here, "whole" means "constituting the total sum or undiminished entirety." Whole , Merriam-Webster.com, https://www.merriam-webster.com/dictionary/whole (last visited June 23, 2017). "Part" means "one of the often indefinite or unequal subdivisions into which something is or is regarded as divided and which together constitute the whole" and "in part" means "in some degree." Part , Merriam-Webster.com, https://www.merriam-webster.com/dictionary/part (last visited June 23, 2017). Therefore, under section 51.014(a)(6) an order denying a motion for summary judgment that in its entirety ("in whole") is based on a free-speech claim or defense is subject to appeal, but so is an order denying a motion that does so to some degree ("in part").
So subsection (a) does not limit "may appeal from an interlocutory order" and subsection (a)(6) authorizes such an appeal if the denied motion for summary judgment was based to some degree on a free-speech claim or defense. A multiple-ground motion for summary judgment that includes one ground based on a free-speech claim or defense is a motion for summary judgment that to some degree ("in part") is based on a free-speech claim or defense. Accordingly, the plain meaning of section 51.014(a)(6) authorizes appeal of an interlocutory order that denies a motion for summary judgment so long as at least one ground is based on a free-speech claim or defense. TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(6).
Had the Legislature intended to limit appeals to just the grounds in a summary judgment motion challenging free-speech claims or defenses, there are several easy ways the Legislature could have stated that limitation. Subsection (a) could have stated, "A person may appeal from an interlocutory order ... to the extent of the relief that...." Or subsection (a)(6) could have stated, "denies a ground of a motion for summary judgment that is based in whole or in partupon" a free-speech claim or defense. But when we interpret statutes we may not add words to-and I submit we may not delete words from-a statute to amend it or that are not already "implicitly contained" in the statute's language. See Fitzgerald , 996 S.W.2d at 867 ; Lee , 807 S.W.2d at 294-95.
Instead of analyzing the text of section 51.014(a)(6), Reyes primarily relies on Astoria Industries of Iowa, Inc. v. SNF, Inc. , 223 S.W.3d 616 (Tex. App.-Fort Worth 2007, pet. denied), to argue section 51.014(a)(6) means that there is appellate jurisdiction to review only those grounds of a summary judgment motion that involved a free-speech claim or defense and that were denied by a trial court. The court in SNF limited its textual analysis to the following:
The pertinent language of section 51.014(a)(6) provides that "[a] person may appeal from an interlocutory order ... that ... denies a motion for summary judgment that is based in whole or in part upon a claim ... or defense ... arising under the free speech ... clause." A plain reading of this language evidences clear legislative intent that a party seeking summary judgment on claims or defenses that implicate free speech be entitled to appeal a trial court's denial of this relief. Nothing in the language of section 51.014(a)(6), however, suggests to us that there is a legislative intent to permit an interlocutory appeal from summary judgment *59 rulings on non-free speech claims and defenses simply because they happen to be included in the same motion.
Id. at 626 (ellipses in original; footnotes omitted). I agree with the first two sentences quoted above, but the textual analysis of the limited scope of appellate review in SNF is confined to the last sentence. The SNF court then proceeded to rely on opinions interpreting the scope of appellate review of subsections (a)(5) and (a)(8) of section 51.014. Id. But neither subsection is at issue in this appeal and neither contains the phrase "in whole or in part" which expands the scope of review as discussed above. In my view, the effect of the SNF court's reasoning is to add or delete words or concepts to amend the statutory text to arrive at the conclusion that section 51.014(a)(6) limits the scope of appeal of an interlocutory order to only free-speech claims or defenses, which is not proper textual analysis. See Fitzgerald , 996 S.W.2d at 867 ; Lee , 807 S.W.2d at 294-95. I disagree with the textual conclusion of SNF for the reasons stated above.
I would conclude the plain meaning of the text of section 51.014(a)(6) authorizes appeal from an interlocutory order that denies a motion for summary judgment containing at least one ground that is based on a free-speech claim or defense. Because the interlocutory order denying DSA's motion for summary judgment falls within the scope of section 51.014(a)(6), I conclude it was appealable, including the ground that challenged Reyes's claim for tortious interference with employment. I would consider the merits of DSA's appeal from the trial court's denial of its motion for summary judgment challenging that claim rather than dismiss the appeal of that issue for lack of jurisdiction.
Split of Appellate Courts regarding Section 51.014(a)(6)
The split among the appellate courts over this jurisdictional issue has existed now for eighteen years. The SNF court recognized multiple appellate courts disagree with its conclusion and instead conclude section 51.014(a)(6) authorizes an appeal of an entire interlocutory order denying a motion for summary judgment so long as one ground was based in whole or in part on a free-speech claim or defense. See SNF , 223 S.W.3d at 626 n.19 (summarizing Cox Tex. Newspapers, L.P. v. Wootten , 59 S.W.3d 717, 720 (Tex. App.-Austin 2001, pet. denied) ; Am. Broad. Cos. v. Gill , 6 S.W.3d 19, 26 (Tex. App.-San Antonio 1999, pet. denied), disapproved on other grounds by Turner v. KTRK Television, Inc. , 38 S.W.3d 103 (Tex. 2000) ; Delta Air Lines, Inc. v. Norris , 949 S.W.2d 422, 429 (Tex. App.-Waco 1997, writ denied) ). In addition to these opinions, DSA cites opinions supporting its position that the scope of appellate review under section 51.014(a)(6) is the entire interlocutory order. See K-Six Television, Inc. v. Santiago , 75 S.W.3d 91, 96 (Tex. App.-San Antonio 2002, no pet.) ; Dolcefino v. Randolph , No. 14-00-00602-CV, 2001 WL 931112, at *3 (Tex. App.-Houston [14th Dist.] Aug. 16, 2001, pet. denied) (op. on reh'g) (not designated for publication). DSA's counsel fulfills their ethical duties by disclosing an additional authority favorable to Reyes's position and the panel opinion that the scope of review is limited: KTRK Television, Inc. v. Fowkes , 981 S.W.2d 779, 787 (Tex. App.-Houston [1st Dist.] 1998, pet. denied), disapproved on other grounds by Turner v. KTRK Television, Inc. , 38 S.W.3d 103 (Tex. 2000).
I observe that the supreme court denied review of every authority on both sides of the split. I also note the panel's opinion aligns this Court with the minority view.
No Previous Opinion of this Court on this Issue
Reyes and the panel opinion do not rely on any previous opinion of this Court favorable *60 to the conclusion that interlocutory appeals under section 51.014(a)(6) are limited to free-speech claims or defenses. DSA argues that in New Times, Inc. v. Doe , 183 S.W.3d 122 (Tex. App.-Dallas 2006, no pet.), a different panel of this Court concluded appellate review was not limited to free-speech claims and defenses under section 51.014(a)(6) :
Although this is an interlocutory appeal under section 51.014(a)(6) of the Texas Civil Practice and Remedies Code, the parties do not contend our review of the issues presented is limited. See TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(6) ; K-Six Television, Inc. v. Santiago , 75 S.W.3d 91, 96 (Tex. App.-San Antonio 2002, no pet.) (where media defendant's motion for summary judgment relied in part on law of libel under statute included in section 51.014(a)(6), entirety of trial court's orders were appealable under section 51.014(a)(6) ).
New Times , 183 S.W.3d at 124 (emphasis added). DSA's reliance, therefore, is on the summary of Santiago in the New Times opinion. DSA also argues the New Times opinion resolved the appellate issue without considering any argument based on a free-speech claim or defense. The panel opinion concedes DSA's argument about the basis of the disposition of the appeal in New Times , but the panel opinion distinguishes New Times because the claims that were resolved there did involve free speech raised in another appellate issue so jurisdiction fell within the panel opinion's view of the limited appellate jurisdiction authorized by section 51.014(a)(6).
Even if the panel is correct about its distinction, New Times clearly did not articulate the panel's view of limited jurisdiction, so the panel cannot and did not rely on New Times for its conclusion. In my view, therefore, the panel opinion is this Court's first expressed conclusion on this important issue of the scope of review under section 51.014(a)(6). Every subsequent panel of this Court-including this dissenting author-will be bound thereby. See Signature Mgmt. Team, LLC v. Quixtar, Inc. , 281 S.W.3d 666, 671 n.1 (Tex. App.-Dallas 2009) ("[I]n the absence of a decision by a majority of the Texas Supreme Court or by this Court sitting en banc repudiating our prior holding in Sarieddine , we are bound to follow it."), rev'd on other grounds , 315 S.W.3d 28 (Tex. 2010). The panel opinion on this important question should be considered by the full court.
Conclusion
Because the panel distinguishes a previous opinion of this Court and for the first time on behalf of this Court draws a conclusion placing this Court in the minority-view regarding the scope of appellate review under section 51.014(a)(6), I dissent from denial of en banc reconsideration. On the merits of the jurisdictional issue, I would conclude section 51.014(a)(6) authorizes appeal from an interlocutory order that denies a motion for summary judgment containing at least one ground that is based on a free-speech claim or defense. Because the interlocutory order denying DSA's motion for summary judgment falls within the scope of section 51.014(a)(6), I conclude it was appealable, including the ground that challenged Reyes's claim for tortious interference with employment. I would consider the merits of DSA's appeal from the trial court's denial of its motion for summary judgment challenging that claim rather than dismiss the appeal of that issue for lack of jurisdiction.
Bridges, Lang, Whitehill, Schenck, and Boatright, J.J., join this dissenting opinion.

The Hon. Michael J. O'Neill, Justice, Court of Appeals, Fifth District of Texas at Dallas, Retired, sitting by assignment.

Again, the trial court granted summary judgment in favor of both defendants on Reyes's defamation per se claims. Those claims are not subject to interlocutory appeal and, therefore, are not before us. Accordingly, we lack jurisdiction to address any argument that the statements at issue on appeal meet a per se standard.

Reyes argues that the party-crashing allegations essentially accuse him of criminal trespass. We lack jurisdiction to address any argument that these statements are defamatory for a reason that would support a per se claim for defamation, e.g., accusation of a crime. That issue was decided by the trial court against Reyes as a matter of law, and it cannot be appealed as an interlocutory matter.

In this regard, we contrast cases looking to the "gist" of a publication to determine the question of substantial truth. See, e.g., Neely v. Wilson , 418 S.W.3d 52, 63-64 (Tex. 2013) ("A broadcast with specific statements that err in the details but that correctly convey the gist of a story is substantially true."); Tatum v. The Dallas Morning News, Inc. , 493 S.W.3d 646, 662 (Tex. App.-Dallas 2015, pet. filed) ("We determine substantial truth by assessing the publication's 'gist.' ").

Reyes's substantive pleading of these claims states in its entirety:
71. Defendants made, published and printed the false and defamatory statements set forth above by negligently failing to ascertain or state the truth. The Defendants either knew or should have known in the exercise of ordinary care that the statements were false. Defendant sacted in concert with a meeting of the minds and conspired to publish the defamatory statements.
72. Defendants did not limit their publication of the statements to persons with alegitimate interest in the information that they contained. Defendant DSO made sure that sponsors, patrons, local media, including Defendant D Magazine, were given unfettered access to Defendant DSO's version of the events and statements. Defendant D Magazine voluntarily published the statements to the public, including to the Plaintiff's employer. Defendant D Magazine did not conduct a proper investigation of the facts before publishing the defamatory statements.
73. The Defendants were negligent and grossly negligent by publishing the defamatory statements with knowledge that they were false or with substantial grounds for knowing that they might be false with reckless disregard to whether they were true or false.
74. Prior to the publication of the defamatory statements described above, the Plaintiff enjoyed a reputation for industry, dependability, openness, and honesty.
75. Defendants were negligent in the publication of the defamatory communications.
76. Defendants were negligent and grossly negligent in permitting and encouraging those who received the defamatory communications to share those communications with others.
77. Defendants were negligent and grossly negligent in failing to have due process inplace so that Plaintiff could have at least known of the charges levied against him by Defendant sand had the opportunity to defend himself before the Defendants publicly branded him as a "party crasher", interloper and trickster.
78. Defendants were grossly negligent m their publication of the defamatory communications.

While we draw our conclusion based on the language of the statute itself, we note that the history of the statute supports that conclusion:
Subsection (a)(6) was added to the interlocutory appeal statute in 1993 in response to lobbying efforts by members of the print media in response to "some highly publicized plaintiffs' libel verdicts in cases that had been believed to be of doubtful merit." Thomas J. Williams, Media Law: Interlocutory Appeal , 67 Tex. B.J. 760, 760 (2004) (characterizing the addition of subsection (a)(6) as "[o]ne of the most significant developments affecting media law in Texas" because it allows "a media libel defendant to take an immediate, interlocutory appeal from the denial of a motion for summary judgment"); see also Act of May 25, 1993, 73rd Leg., R.S., ch. 855, § 1, 1993 Tex. Gen. Laws 3365, 3365-66.
State v. Valerie Saxion, Inc. , 450 S.W.3d 602, 611 n.8 (Tex. App.-Fort Worth 2014, no pet.).

Because I agree with the panel opinion's analysis of the free-speech claim or defense, this dissenting opinion refers to the free-speech claim or defense in section 51.014(a)(6) without further explanation.